The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated, everyone. And good morning. We have Judge Beatty with us virtually. Judge Beatty, can you hear us? I can. Yes. Thank you, Judge Robinson. All right. The cases will be called in the order listed on the docket. The first five cases, Granadino or Kia v. Garland, Guerrero-Rosobald v. Garland, Lachuca-Munguia v. Garland, United States v. Cota, and Foster v. Kijikasi have been submitted on the briefs. Our only case on calendar for argument today is United States v. Brollini. Counsel for appellant, please approach and proceed. Good morning. Good morning. Edie Cunningham of the Federal Defender's Office. On behalf of Mr. Brollini, I'd like to reserve four minutes. Counsel, will you please be reminded that the time showing is your total time remaining? Yes, Your Honor. Reversal of counts one and two is required because the verdicts could be non-unanimous and based on acts outside of the statute of limitations and because of other instructional errors. Evidentiary errors alone and in combination, which went to the heart of Mr. Brollini's good-faith defense, also require reversal of all counts. I'll start with the statute of limitations issue. As the government concedes, it had to prove an act of evasion and corrupt interference within the statute of limitations. In the verdict, the jury had to find that these acts occurred unanimously or that at least such acts occurred outside of the statute of limitations unanimously. The district court did not instruct the jury on this burden or that special unanimity was required, and the jury made no findings. The government alleged and argued acts outside of the statute of limitations, including the Noncenelli Trust creation and the use of the MyIsis Bank. Reversal is required because there is a genuine possibility that the jury convicted based on acts outside of the statute of limitations. Do you think this is subject to harmless error review, not plain error? Your Honor, I do, but whether we're on harmless error or plain error review, the outcome is the same. All plain error review requires Mr. Brollini to show is a reasonable, excuse me, a genuine possibility of a different outcome. And the Supreme Court has made clear since the Fuchs case that the defendant's burden is a reasonable probability, which is less than a likelihood. And that occurred here. Your Honor, would you like me to address why I feel the error is preserved? Well, I guess I'd be more curious as to why you think it was prejudicial, because it seems like there were plenty of actions that he took that were within the statute of limitations period. So why wouldn't, why would we think the jury would only rely on the ones that were, that were the earlier ones? Yes, Your Honor. The government, I think the MyIsis evidence was particularly important in this case. The government's witnesses painted MyIsis in a very negative light, characterizing it as an abusive tax scheme designed to help people defraud the IRS, and also over objection let in that Mr. Hicks was convicted of conspiring to defraud the IRS. When members used MyIsis, they completely went off the grid. Their money was pooled with other members, and there was no way to differentiate. When they used the digital money orders, there was no identification, personal identification on the money orders, and I believe that's at ER page 360. MyIsis didn't comply, and there was no way to use the currency transaction reports. They needed a warrant, the IRS, to actually get information about MyIsis, as opposed to Money Mart, which government witnesses agreed was an absolutely legitimate cash checking business, which millions of Americans use to cash their paychecks. Some people don't like to use bank accounts. Now, the government did allege that Mr. Brolini used a false social security number there, but the jury acquitted on that, and under the evidence, it just didn't really make sense, because he provided his correct driver's license, his name, his address, his company's name, its employee identification number. But wasn't the evidence that he used, he specifically used Money Mart not in the way that many people would for just true check cashing purposes, but to disguise his assets? Well, Your Honor, he did use it the way that most people did, in that he cashed his paychecks there, you know, cashed what he got paid. A rational jury certainly could distinguish between those two things and find that MyIsis crossed the line of tax evasion and corrupt interference because of the concealment involved, whereas Money Mart didn't, and I would note the Carlson case, actually evaluated the sufficiency of evidence for upholding an evasion claim, and in that case, the defendant not only tried to hide his assets, but he used a false social security number, he used a false place of birth, and a false date of birth, so there was no way to trace what he was doing with that bank account. But here, it's not just Money Mart, right? It's the lawsuit against the IRS agent, it's the, there's a few other things, too, and so it's not just, perhaps I, you might have a stronger argument if it were Money Mart versus MyIsis and nothing else, but there were other actions that he took that were within the limitations period, no? There were, Your Honor, but, but those, that evidence was a lot more ambiguous, I believe, because jurors could have rationally concluded that they were expressions of Mr. Berlini's frustration at the IRS not sitting down with him to go through his, his belief that, that what they were doing was illegal. Also, an expression of his philosophy. Also, these acts admittedly didn't have an impact on the IRS, and I understand the government doesn't have the burden to prove that, but that is something that the jury can take into consideration in deciding whether there's proof beyond a Mr. Berlini said the promissory notes were just to stop the accrual of interest, and I think jurors could find that reasonable. But another thing that it's important to note is because the jury wasn't told that it had to deliberate on those other acts, I think there's a very good chance that the jurors started with the evidence chronologically, went through it, got to MyIsis and said, this is enough for us on both tax evasion and corrupt interference, and stopped right there and did not even deliberate on the other counts, because they, there was nothing in the instructions that told them that they had to do so. And when considered- Ms. Cunningham, are you saying that the evidence of acts that occurred within the limitations period was not sufficient to sustain the conviction? Your Honor, it was sufficient to sustain the conviction, but it was not in light of the statute of limitations defense and the unanimity requirement. That was not sufficient to uphold the verdicts if the verdicts were based on acts prior to April 3, 2007. That's the cutoff. But that's the point. How do we know that the verdict was based on acts prior to the statute of limitations date? Your Honor, that is the point. We, there's no way to tell. And for that reason, because the verdict could be based on a legally impermissible theory and could be non-unanimous, the verdict must be reversed. Is that the test, if it could be based? If there's a genuine possibility. And for the reasons that I explained, there is a genuine possibility, particularly when we consider that the jurors may not have even deliberated at all on the post-MyIsis acts. And that poses a particular problem for the Sixth Amendment. But wouldn't that be in violation of the instruction they're given to consider all the evidence? Well, Your Honor, they can consider it, but they don't need to reach a verdict on all the evidence. They were never told that they had to reach a verdict on the post-2006 acts. Well, they were told what the elements of the statute were and what they had to find in order to convict Mr. Brolini. So are you saying that they could do that without, that they could follow those instructions and still not reach a valid verdict? Yes, Your Honor. How? They could have. Because they could have, as I said, come to the evidence chronologically, said, okay, the trust, yes, we think that that qualifies under both. Or if they didn't, they could come to MyIsis and say, yes, we think that meets the elements for both tax evasion and corrupt interference, and just stopped right there. And if they — Is that realistic, though, counsel? I mean, generally, having been a trial judge, that's generally not how juries work. They go through all of the exhibits and the testimony before they reach a verdict. So absent some indication from notes or some statements from jurors, that's a real stretch as far as I'm concerned. Well, Your Honor, this was a long, tedious case. The verdict was rendered the Thursday before Thanksgiving. I think reasonable jurors would do that because they don't want to parse through this ambiguous evidence that could be an expression of his philosophy. You know, all he wanted in this lawsuit was a declaration that he wasn't a government employee, renunciation of his citizenship. You know, what difference does that really make? That evidence was definitely not as clear-cut as the MyIsis evidence, and possibly the trust. I mean, there wasn't much — there wasn't much of value in the trust, but it is clear that he — that he put his trust — put his vehicle in a trust that was not in his name in 2005. So juries could understand that and see that. It wasn't as ambiguous as I've described as the post-2007 evidence. So, you know, again, I don't think this Court respectfully can find this evidence to be harmless in a way that complies with its duties to respect the Sixth Amendment and to ask whether the Court is sure that the guilty verdict actually rendered in this trial was surely unattributable to the verdict. But you do acknowledge that we look at the evidence that was post-statute of limitations to determine the strength of the case that the prosecution presented, correct? Yes. You may look at that, but — excuse me, Your Honor — may look at that, but the Court must also consider the genuine possibility that the jury could rationally distinguish that it is plausible. That's all the Supreme Court says in Johnson that is needed to meet the plain error burden. That it is plausible. That the jury could have convicted impermissibly on acts outside of the statute of limitations, coupled with the fact that they not only had to do that, but they had to unanimously do that. And in the cases in which this Court reverses because there's possible juror confusion on unanimity, really, if there's any genuine possibility that that could have happened, that requires reversal. Fuchs discussed the Drome case and also the Southwell case, which is cited in the briefs, talks about that. There are other — another case, which admittedly was not cited, but which follows that same theory, is United States v. Lapierre, 796, F. 3rd, 1090. But all of the cases that discuss where there is a genuine possibility that the verdict was non-unanimous, reversal is required. Can I ask you about another part of your case? Yes, Your Honor. Which was the questioning of your client about the jury instructions and whether he agreed with them? Yes, Your Honor. Is it your position that the government can never do that, or that — or is there some circumstances in which that should be allowed? Your Honor, I think it's highly unusual, and it's very dangerous to do that. If the Court reviews the discussion, even the District Court in this case was a little hesitant. I don't want something to give the impression that I'm being set up against the defendant. But in this case, there was really no point to it. This was definitely impermissible under 403, and it called for a legal conclusion, which was also impermissible. Because Mr. Berlini had just testified on direct that he still strongly believed that the government did not have the authority to tax income derived from his labor. So it was a foregone conclusion that he was going to say that the Court's jury instruction didn't change his mind, and that was the readily foreseeable effect of it. So it seems that the real purpose, and certainly the effect, was to improperly highlight this conflict between the defendant and the presiding judge, and to cast the defendant in a negative light, and to provoke the kind of emotional response against the defendant that 403 prohibits. Even if it should have been prohibited, did the District Judge essentially catch it quickly enough and shut it down fast enough? No, Your Honor. The District Court let it happen. The District Court let the questioning proceed. Well, but there was instruction saying there's not going to be follow-up on it, and once there was the colloquy, it looks like the government had one more, you know, it repeated the question that led to the break in action, and then that was essentially it. Well, if I recall, that colloquy with Mr. Berlini went on for two or three pages before he got to his answer, before the prosecutor got the answer he wanted. So it was extended. And then again, another reason why this requires reversal is that the government not only questioned about it, but emphasized it in closing argument, both in the opening close and the rebuttal close, 882 and 907 of the ER. So this was something that was really stressed to the jury during closing argument. And definitely that error, in combination with letting in the Hicks conviction, which Mr. Berlini didn't even know the ins and outs of, and criminal convictions of somebody else were typically irrelevant and hearsay and do not come in, that was highly prejudicial under 403, and another way to pile on more dirt about MI-ISIS, because the government obviously felt that MI-ISIS was its strongest point. And then paradoxically, Mr. Cryer's acquittal was kept out, something that Mr. Berlini did know about, and which had a big impact on him. He didn't learn about it until 2007, but as we know, that was the crucial time for the statute of limitations. And it was also crucial because by that time, Ann Taylor and others were engaging with him more about, you know, look, we really think you're supposed to pay taxes. And he said, well, I don't think you have lawful authority. Please sit down with me. If he hadn't learned about Mr. Cryer's acquittal, he may well have been persuaded. So it was a very key piece of evidence, and it was also very important because the comment on the jury instruction obviously came in 2019, far past the indictment. But Mr. Berlini wasn't able to rebut that with the powerful evidence of Cryer's acquittal that he became aware of that really solidified and reinforced his beliefs. So I believe any one of those errors alone could have changed the jury's credibility assessment. They were grappling with the issue of good faith, which the jury instructions show, page, excuse me, the jury questions show 943 through 46. So there's no way that in combination, those errors could be harmless or individually. So reversal of all counts is required. And if I may reserve the rest of my time. All right, counsel. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court, I'm Shelly Clements with the U.S. Attorney's Office for the District of Arizona. In this case, the District Court did not err plainly or otherwise in any of its instructions to the jury. To begin with, the District Court did not plainly err by not giving an interrogatory asking the jury to find an act within the statute of limitations. Can I take you to the issue we just left, which was the cross-examination of the defendant on the district judge's instructions? How commonly is that done in your experience? Because I've not seen that fairly regularly, if at all. Your Honor, I found one other case where it occurred, but it was not an issue in the appeal. And I apologize before preparation for this hearing. I went back to find it and, of course, could not locate it again. But again, it was not raised as an issue in the appeal. But in this particular case, well, in any case, it would not be an objectionable or reversible error. The government did not ask the defendant if he agreed or disagreed with the Court. The government asked the defendant if, upon hearing this instruction, and the government agreed that it was up to the courts to define what income was. In fact, that was something he emphasized heavily in his PowerPoint presentation. It was the second slide in his PowerPoint presentation, that it's up to the courts to define. But he agreed that it's up to the courts to define income. So the government gave him the instruction that the court was going to give about what was income and asked the defendant if he changed his mind. But wasn't that, in essence, asking him if he disagreed with the judge? No, Your Honor. It was asking him to — it was basically attacking his credibility, which is appropriate to do on cross-examination. Here is a man who is — But in that way? Is it permissible to do it in that way? Yes, Your Honor, because we didn't ask the defendant if he agreed or didn't agree with the Court's instruction. We asked him if that changed his mind, given the fact that he believes it's up to the courts to define income. It did not. And that, Your Honor, went to the heart of his good-faith defense, to show that he really wasn't operating with a good-faith misunderstanding of the law. He just didn't like it, and he disagreed with it and wasn't going to follow it. Disagreed. That's the point, that he disagreed with the instruction that the judge gave. And so it's hard to say that that question didn't raise the implication of disagreement with the judge. Except throughout the case, the defendant, again, his own emphasis was that he agreed that it was up to the courts to define the law. And then he said, but this doesn't change my mind. And then on redirect, any possible issues that could have been there was fixed by the defense basically asking him, well, why doesn't this change your mind? Well, I mean, any time a defendant testifies on his own behalf, is this line of questioning permitted in any criminal case? If it's asked in the way that it was. And when the, in this, like I said, in this case, the defense, the heart of the defense was whether or not he had a good-faith misunderstanding of the law or whether he acted in mere disagreement with it. And in that case, the government had the burden to prove not only that he acted willfully, but that he didn't act in good faith. So the government was entitled to impeach his credibility by showing that what he believed was not really true, or what he professed to believe was not really true. And I would know — But if the question was, if the issue they wanted to, you wanted to show was whether he still maintained these beliefs today, presumably that could have been asked in a way that didn't create this possible confrontation with the district court. Well, I would say that that was no different than what the court, than what the government did. We asked him if that changed his mind. That's the same as asking as if his beliefs are the same as they are today. But you could ask him if he had those beliefs without referring to the instruction that was going to be given by the court. But, Your Honor, the instruction was a correct statement of the law. And according to the defendant, it's the judge's law that he was supposed to be following this. So is it your position that this type of question would only be permissible if the defendant was relying on a good-faith defense? I would submit, Your Honor, that in this particular case it was appropriate because he was relying on a good-faith defense. Well, what about — are you saying that in any case, in any criminal case where a defendant is relying on a good-faith defense, this type of question is permissible? I would say it is, Your Honor, if it's asked in the way that it was for the purpose that it was, which was to show that the defendant's good faith was not realistic and to impeach him, which is exactly what happened in this case. Well, what do you make of the fact that the district judge recognized fairly early on in this — or I guess I would say maybe in the middle of this colloquy that this line of questioning had risk? She did, which is why she limited what the government could ask. And the government asked, is it okay if I ask it this way? Does this change your mind? And the court agreed with that, but then stopped any further follow-up. In doing so, she made sure that there wasn't any follow-up that would pit her instructions against the defendant. But, Your Honor, I would submit this type of colloquy is no different than the instruction that came much earlier in Mr. Berlini's testimony, wherein — and it was the same instruction that was given when government experts testified regarding the law — that basically the evidence saw for a limited purpose and that the defendant was going to be giving his view of the law, but the jury was not to accept that as the law. This question is even less than what that instruction is, because that instruction is actually telling the jury, that's not what the law is. I'll tell you what the law is. And this is no different. It imposes no further harm to the defendant. But even if this court finds that that question went too far, that it shouldn't have been asked, in this case, the overwhelming evidence belies any claim that the verdict could have been different, that this one single question would have been the linchpin that led the jury to the defendant being convicted by this jury. The defendant in this case took the stand, and after the government had presented all this overwhelming evidence of affirmative acts of evasion and corrupt interference with tax administration, he admitted them. And with the exception of the vehicle trust, he admitted the reasons behind them, which was he was doing it, in part, to protect his money from the IRS. He filed a lawsuit in order to try to get either a default judgment, hoping the government just wouldn't respond, or to get Ms. Taylor to write a letter saying he was a person who didn't have to pay taxes. He submitted the promissory notes, again, to gain an unlawful benefit, because he was hoping to stop the incursion of further interest. So given the fact that not only did the government prove its case beyond a reasonable doubt, but the defendant admitted every single act, and did not quibble about when they occurred or why they occurred, in that case, this one question could hardly be the one thing that caused the jury to convict him. Counsel, were you trial counsel in this case? I was not, Your Honor. Can we turn to the acquittal and the conviction that were precluded and then allowed? Yes. So why do you think it was fair to allow, to preclude the evidence of the acquittal, but then to allow the evidence of the conviction? Well, I think it's fair because of the reliability factor of these, and what these say. An acquittal is not a finding of innocence. It's ambiguous on its face. We don't know, at that point, why the jury acquitted the defendant. It could have been because they believed his good faith beliefs. It could have been because they just felt that the government didn't prove its case. So given that inherent ambiguity as to why a jury would come back with not guilty, in that case, it was clearly not error for the court to preclude evidence of that acquittal. And I would note in U.S. v. Ross, this court found similarly that evidence of an acquittal was appropriate in that matter, or precluding evidence. I apologize. In that case, the defendants wanted to rely on advice given to them by a tax advisor, and the court precluded it. And this court found that was appropriate because it wasn't something they knew about when they began their actions of affirmative action evasion and corrupt interference. But instead, it was something that came up later, and the court said that that would only go to the actions that occurred after that time they got the advice. Similarly here, Mr. Cryer's video and his acquittal is not what set the defendant down this path, and he readily admitted that. He did not see that video until sometime after 2007, because that's when the video was made. But before that time, he had already committed multiple acts of evasion and corrupt interference. By using the Money Mart, or by using MyISIS, by putting the vehicle into trust, by his beginning use of that starting in 2006, beginning the use of Money Mart to hide funds from the IRS. His behavior did not change upon learning of Mr. Cryer's acquittal, so it had absolutely no relevant value at this point to how he believes. In contrast, the conviction of Mr. Hicks was highly reliable at that point, because what it told us was that a jury found beyond a reasonable doubt that by his actions, he violated the law. And in that case, the government did not admit that, but the truth of the matter asserted, but to attack the defendant's claim of good faith. The defendant was using MyISIS services by his own admission to protect his money from the IRS. And here he is told by the government that MyISIS is being shut down, that there will be charges. In fact, he did an affidavit and was intending to testify, he had agreed to testify against Mr. Hicks. So he says he wasn't aware of that conviction, but your position is a jury could disbelieve that? I think a jury could disbelieve that. The fact that he was going to testify against the guy, and then it was brought up indirect. But even if he didn't know of the conviction, he would still notice that by using alternative financial services like MyISIS, that is switching over to Money Mart, he was violating the law. Right there, that was sufficient to give him notice. This is a huge red flag, that there was a problem with his claim of good faith belief, that he wasn't violating the law. I would also say that the evidence of Mr. Hicks' actions was so harmful and so great, it was one portion of several acts that were proven of acts of evasion and acts of corrupt interference. And in fact, Ms. Plowder testified there were many aspects of the business that had legality to them, and had appearances of legality to them. The fact that they had a public website, that they gave out money orders. She testified it was legal to pay bills with money orders. It was legal to pay bills with a preloaded debit card. So to claim that this one tiny bit of evidence would have been, again, the sole reason that the jury would have convicted the defendant just doesn't seem plausible in light of all the other overwhelming, uncontroverted evidence that came out in this case. Counsel, on a different issue, you acknowledge, don't you, that the supervised release condition should be remanded? Yes, Your Honor. If the court has no further questions, I will submit on the briefs. Thank you, Counsel. Thank you. Rebuttal. Counsel? Yes, Your Honor. Just a second. Your Honor, the government contends that the acquittal would not have been important evidence about Mr. Brolini's state of mind, because it wasn't what started him down that path. But the jury had to prove that he had a guilty state of mind within the statute of limitations. So the fact that he learned of Cryer's acquittal in 2007, right at the time for the cutoff of the statute of limitations, makes it very, very important. And Mr. Brolini's good faith belief did evolve. I mean, beliefs can evolve. And certainly the video, the acquittal, and reading Cryer's memorandum is something that Mr. Brolini testified solidified and reinforced his beliefs. And without that, he might have changed his mind, and we might not be here today. He might have been persuaded by the arguments that the IRS was making, telling him that these arguments were frivolous. But he was allowed to put on a lot of that video. He was, but he was not allowed to let the court know that, excuse me, not the court, the jury know that Mr. Cryer, who testified in that video, and who was an attorney, and so did IRS tax attorneys, IRS employees, former employees, congresspeople, spoke on that video. He wasn't allowed to know that Mr. Cryer explained that his theory, and it was similar to what Mr. Brolini was doing, and that he was, in fact, acquitted. And it doesn't really But was there any evidence in the record? I mean, was there a jury verdict form or anything that corroborated the fact that he was acquitted, other than his statement in the video? Your Honor, I would have to go look up in the record, but I am sure that it did happen. I remember the district court looked it up. But my question was, can we look in the record to anything that confirmed that he was acquitted? There is a statement by the presiding district court judge that she looked it up and confirmed that it did occur, and I can find that for you after the fact. Oh, that's okay. I was just curious. But no, there's nothing in the record that the jury could have seen, which is the problem. That was a very relevant piece of evidence that the jury was not allowed to hear about. And it could — it is an important reason why Mr. Brolini stood firm in his beliefs, even after the IRS started dealing with him. But wasn't the court concerned that if that evidence were allowed, that it would go into a side excursion as to why he was acquitted, what the charges were, how close the evidence was to the evidence in this case? Wasn't that a legitimate concern? Well, Your Honor, actually, the judge said that it would be unfairly prejudicial and possibly cumulative. It wasn't cumulative because it was the only acquittal. The judge didn't cite juror confusion. And given the fact that the judge gave a cautionary instruction telling the jurors exactly how they were to use the evidence, just as it pertained to Mr. Brolini's good-faith belief, juror confusion was not a strong consideration. But I didn't say juror confusion. I said that it would lead to kind of a mini-trial on the context of that acquittal. Your Honor, no, because that evidence would not have been relevant or admissible. The only thing that matters is that Mr. Brolini knew about it and he relied upon it. And one last point is that the government says — Well, before we leave that, though, wouldn't the prosecution then have had the right to distinguish that acquittal for purposes of whether or not it was reasonable for him to rely on it? Your Honor, I don't think that would have been appropriate because the prosecution would have no idea about that acquittal, about why the jurors acquitted anyway. The purpose is that Mr. Brolini knew about it and that's why it was significant, one of the things that formed his beliefs. And, you know, the government emphasized all the advice the IRS was giving him and says that that was fatal to good faith, but the jury was obviously on the fence about good faith as shown by there's several questions about it, ER 943-46. All right. Thank you, Counsel. It appears that there are no further questions. The case just argued is submitted for decision by the Court and we are in recess until 9.30 a.m. Wednesday morning. All rise.
judges: RAWLINSON, BADE, BRESS